J-S04022-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KIM ALEXANDER BURGESS, JR. | |
| Appellant | No. 401 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 2, 2020
In the Court of Common Pleas of Lancaster County
Criminal Division at No: CP-36-CR-0003837-2018

BEFORE:  OLSON, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 7, 2021**

Appellant, Kim Alexander Burgess, Jr., appeals from his judgment of sentence of 23½-62 years' imprisonment for drug delivery resulting in death, conspiracy to deliver fentanyl, delivery of fentanyl, and criminal use of communication facility.[1]  We affirm.

The following evidence was adduced during trial:

Alyssa Stoltzfus ("Stoltzfus") testified that she was the sister of Jeannie Heiser ("the victim"), they lived together, her sister occasionally used drugs, and her sister bought the drugs from someone named Elby who was on house arrest.  On October 5, 2017, the victim told Stoltzfus that she just used heroin and it was really strong.  Later that day, Stoltzfus found the victim lying face down on the floor.  Trooper Jonathan Cox of the Pennsylvania State Police ("PSP") responded to the scene and found the victim deceased in the living room.  Dr. Wayne Ross, a forensic pathologist, testified that the victim died of acute fentanyl toxicity.  According to a report from National Medical Services Lab, the

---

[1] 18 Pa.C.S.A. § 2506(a), 18 Pa.C.S.A. § 903(a)(1), 35 P.S. § 780-113(a)(30), and 18 Pa.C.S.A. § 7512(a), respectively.

victim had 2.4 nanograms per milliliter of fentanyl in her blood, which was lethal. Detective Cox found four empty wax paper baggies or sleeves in the victim's purse that appeared to contain heroin residue.

PSP Trooper Brian McNally testified that the four wax paper baggies were sent to the PSP laboratory for analysis and it was determined they contained fentanyl. Cox retrieved the victim's phone and pass code. Trooper McNally testified that from an external review police saw a number of text messages between the victim and a female listed in contacts as Elby. PSP analysts determined the phone number associated with Elby belonged to Lauren Miller ("Miller"), who was on house arrest.

Trooper McNally obtained phone records for both Miller and the victim which showed a substantial amount of text messages and phone calls between the two of them on October 5, 2017. A picture from the victim's phone which was taken outside of Miller's residence also showed a white wax paper fold stashed underneath the threads of a broom, consistent with the baggies found in the victim's residence.

Miller's phone records showed that she was in contact with telephone number 717-984-9568 on the morning of this incident, while she had very little contact with any other parties. Police obtained phone records for 717-984-9568, and the subscriber came back as Mike Jones of 240 King Street in Lancaster. Police were not able to locate that individual. Police also obtained detail records showing subscriber information, call logs, text logs, and information detailing which cellphone towers were used to see where the phones were located. Through investigation, police learned that Miller contacted Appellant to see if he would sell heroin to the victim.

Police interviewed Miller three times. Miller acknowledged she was not honest when she met with Trooper McNally on October 5, 2017, because Appellant was her friend and her drug dealer. Miller was also not truthful the second time they met. However, Miller stated she was truthful when they met in February of 2018 after she was arrested and stopped using drugs.

On February 20, 2018, Miller was interviewed by police and she identified Appellant as the person responsible for delivering the drugs which caused the victim's death. At trial, Miller

acknowledged she was known as Elby and stated she had been addicted to opioids for close to ten years. Miller knew Appellant for most of that time because she purchased drugs from him. Miller stated that the victim called her on October 5, 2017 to buy heroin, and Miller contacted Appellant by text and phone so he could make the delivery. The victim was then to bring some heroin to Miller because Miller was on house arrest for a 2016 charge of delivery of heroin. Miller did not have to pay for the drugs she was going to receive because Appellant "owed me some." Miller admitted she coordinated the phone calls and arranged the deal because the victim did not know Appellant. Miller provided the victim and Appellant with a description of each other and told the victim where to meet Appellant in downtown Lancaster. Miller testified that the victim texted her from outside Miller's house after the drug delivery was completed indicating the victim was leaving the drugs near a broom on the porch. Miller then retrieved four small bags of drugs from outside.

Within the next few days, Appellant traveled to Miller's house to deliver more heroin directly to her, at which time Miller told Appellant that the victim had died. Appellant went ahead with the drug deal.

Miller informed Trooper McNally that Appellant had a girlfriend named Jennifer Simmons ("Simmons"). Trooper McNally located an address for Simmons and went to her residence. Simmons was not there, but her mother, Mary Jo Russin ("Russin"), was. Russin testified at trial that she knew Appellant since 2014 because he dated her daughter. Appellant lived with Russin from May through Labor Day of 2017. In August or September of 2017, Russin suspected that Appellant had a burner phone. Burner phones are cheap, easy to obtain, non-traceable, and do not require identity because they are prepaid. Drug dealers commonly buy these phones under a fake name to elude law enforcement because they are easily destroyed and the dealer purchases another one with a new number and no content stored on the phone.

When Russin searched the room Appellant shared with Simmons, Russin found a receipt inside a Metro PCS box with the name of Mike Jones. Russin called the number on the receipt (984-9568) and Appellant answered the phone.

During her testimony, Russin acknowledged pending charges for obtaining a controlled substance by fraud, forgery, deception,

misrepresentation, or subterfuge, but stated no promises had been made to her in exchange for her testimony.

Trooper McNally testified that subsequent investigation determined an individual by the name of Stephanie Custer ("Custer") called the phone number belonging to "Mike Jones" more than 150 times from the beginning of September to the middle of November. Custer was located in SCI Cambridge Springs and was later interviewed by police. Custer testified she bought heroin from Appellant for a few years, including from the middle of 2017 through late that year. Custer would text Appellant to get heroin and Appellant would ask how much she wanted. When told there were 139 contacts from September 26, 2017 through October 14, 2017 between her phone and the phone number associated with Appellant, Custer was surprised the number was not higher because the contacts were "constant." After Appellant was placed on house arrest following the victim's death, he continued to sell heroin to Custer out of his bedroom window. In early 2018, Appellant told Custer to be really careful because it was really strong, and Custer overdosed twice in less than one week on heroin she got from Appellant.

Custer stated she was in state prison for theft, forgery and paraphernalia charges, but no promises were made to her in exchange for her testimony.

Detective Stephen Owens ("Owens") testified as an expert in the [field] of cellular records, cellular records analysis, digital forensics, and tower location data. Detective Owens reviewed an extract from the victim's cellphone which contained contacts, text messages and pictures. Detective Owens reviewed call detail records for the phones of Miller and the victim which were obtained from phone companies. Detective Owens also reviewed call detail records from T-Mobile for phone number 717-984-9568, which provided a subscriber name of Mike Jones and an effective date of August 20, 2017. Metro PCS is the prepaid arm of T-Mobile.

Detective Owens stated that tower location data established the victim's cellphone was located in Lancaster City on October 5, 2017, at 10:48 a.m., near the area where Miller stated she arranged for the victim and Appellant to meet for the drug deal. The cellphone belonging to Appellant/Mike Jones was also located in Lancaster City at 10:45 a.m., in the area of the drug

transaction. The two phones were generally in the same area between 10:45 a.m. and 10:48 a.m., while Miller's cellphone was at her residence.

Detective Owens noted there was a call from Miller's phone to the phone of Mike Jones/Appellant at 10:45 a.m., which was consistent with Miller's testimony that she was trying to coordinate the meeting between Appellant and the victim. At the time of the call, Miller's phone was utilizing the tower by her residence. On October 6, 2017, the day after the overdose, the phone belonging to Mike Jones/Appellant was located at the tower near Miller's residence.

Detective Owens found photographs on the victim's phone, taken from Miller's residence on October 5, 2017, at 12:35 p.m., which showed heroin glassines. Detective Owens then found a text between Miller and the victim at 12:37 p.m. stating, "you're the best, I owe you bigtime." Police and EMS were dispatched to the victim's residence for cardiac arrest at 3:24 p.m.

Detective Owens stated that while he was testifying about the suspect phone and not the person, he compiled a list of the most frequently called numbers to identify those individuals who could associate the phone with a specific person. Records showed that Russin made a series of calls to the suspect phone on September 3, 2017. Miller had 646 contacts with the suspect phone between September 23 and October 12. Custer also had frequent contact with the suspect phone, so Detective Owens recommended that police speak to her. According to Detective Owens, the records were consistent with and corroborated the witness testimony that Appellant utilized phone number 717-984-9568.

Trial Court Opinion, 5/6/20, at 2-7 (citations and footnotes omitted; minor editing).

On September 26, 2019, following a three-day trial, the jury found Appellant guilty on all counts. The court ordered a pre-sentence investigation report. On January 2, 2020, the court imposed the following sentence on count 1 (delivery of fentanyl): 15-30 years' imprisonment; count 2 (drug

delivery resulting in death): 20-40 years' imprisonment; count 3 (criminal use of communication facility): 1½-7 years' imprisonment; and count 4 (conspiracy/delivery of fentanyl): 2-15 years' imprisonment. The sentence on count 1 was concurrent with the sentence on count 2. The sentences on counts 3 and 4 were consecutive to one another and consecutive to the sentence imposed on count 2.

Appellant filed a timely post-sentence motion to modify sentence, which the court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal:

I. Did the trial court err in permitting Mary Jo Russin to testify generally to [Appellant]'s purported use of burner phones and alleged use of her vehicle, which was unrelated to his alleged sale of heroin to Jeannie Heiser and Lauren Miller, where said testimony was more prejudicial than probative and not relevant under Pennsylvania Rule of Evidence 404(b)?

II. Did the trial court err in permitting Stephanie Custer to testify that [Appellant] sold heroin to her out of Days Inn in 2017 and from his aunt's house in 2018, that in 2018 he told her the stuff he was selling was really strong, that she drove him to Weis Market where he stole energy drinks, and that [Appellant]'s girlfriend told her [Appellant] was on house arrest because a girl died; and was said testimony more prejudicial than probative and not relevant under Pennsylvania Rule of Evidence 404(b)?

III. Did the trial court err in permitting [Detective] Owens to testify, beyond the scope of his expertise, that [Appellant] was in possession of and using phone number (717) 984-9568; and by doing so, was Detective Owens invading the province of the jury and weighing the credibility of other witnesses regarding matters outside his area of expertise?

IV. To the extent that the jury found [Appellant] guilty of delivering fentanyl to [the victim], should this charge have merged with drug delivery resulting in death at sentencing; to the extent that the jury found [Appellant] guilty of delivering fentanyl to Lauren Miller, was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that [Appellant] knew that [the victim] was delivering some of the fentanyl she received from him to Ms. Miller?

V. Was the aggregate sentence of 23.5 to 62 years' incarceration manifestly excessive and an abuse of the court's discretion; further, was the sentence imposed for drug delivery resulting in death clearly unreasonable?

Appellant's Brief at 9-10.

In his first two arguments, Appellant challenges the admissibility of Russin's and Custer's testimony under Pa.R.E. 404(b). We review these arguments together because they involve similar subjects, and we conclude that the trial court acted within its discretion by admitting this testimony.

Our standard of review regarding evidentiary issues is well-settled:

The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Glass*, 50 A.3d 720, 724-25 (Pa. Super. 2012).

Pennsylvania Rule of Evidence 404(b) provides:

**(1)** **Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to

- 7 -

show that on a particular occasion the person acted in accordance with the character.

**(2)** **Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

**(3)** **Notice in a Criminal Case.** In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

*Id.* Both prior and subsequent bad acts are admissible under Rule 404(b)(2). *Commonwealth v. Kinard*, 95 A.3d 279, 285 n.3 (Pa. Super. 2014) (*en banc*).

In addition to the exceptions listed in Rule 404(b)(2), evidence of crimes, wrongs, or other bad acts "may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime." *Commonwealth v. Crispell*, 193 A.3d 919, 936-37 (Pa. 2018) (certain citations and quotation marks omitted). Evidence of other bad acts is admissible under the *res gestae* exception where the particular crime or act was part of a chain, sequence, or natural development of events forming the history of a case. *Id.* The purpose of *res gestae* evidence is to provide a natural backdrop of events so that the jury does not have to judge the behavior of the defendant and other actors in a vacuum. *See*, *e.g.*, *Commonwealth v. Hairston*, 84 A.3d 657, 670-71 (Pa. 2014) (evidence of

defendant's sexual assault of stepdaughter was admissible at his trial for murdering his wife and son, since (1) stepdaughter reported defendant's assault to police, (2) defendant threatened to murder wife and son in retaliation for stepdaughter's report, and (3) murder of wife and son took place two weeks before trial for the assault was scheduled to begin); *Commonwealth v. Richter*, 676 A.2d 1232, 1235 (Pa. Super. 1996) (in rape prosecution, evidence of defendant's prior brutal rapes against ex-wife admissible "not . . . to establish a propensity to commit rape [but] to show the victim's state of mind in failing to physically resist [defendant's] advances").

When the trial court admits evidence of a defendant's other bad acts, "the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Solano*, [] 129 A.3d 1156, 1178 ([Pa.] 2015).

Here, Russin testified that she knew Appellant because he dated Russin's daughter for several years and lived at Russin's house with her daughter during the spring and summer of 2017. Russin did not fully trust Appellant or her daughter, who was a heroin addict. At one point during the summer of 2017, Russin's car went missing, and she found a trip to Philadelphia on the EZ-Pass transponder. Russin previously had seen her daughter and Appellant in possession of burner phones. She also saw Appellant with more than one phone, but he denied that he had an extra

phone. In the late summer of 2017, Russin searched the room Appellant shared with Russin's daughter and found a receipt with the name of Mike Jones. Russin called the number on the receipt, (717) 984-9568 (the "Mike Jones phone number"), and Appellant answered the phone. This confirmed Russin's belief that Appellant had a burner phone, and she threw Appellant out of her house. N.T., 9/24/19, at 285-303.

Appellant acknowledges that certain details in Russin's testimony are admissible, specifically the facts that Russin knew Appellant, found the receipt with the name of Mike Jones, and contacted Appellant at the Mike Jones phone number. Appellant's Brief at 35-36. These facts demonstrate that Appellant used the Mike Jones phone number—a critical fact because approximately one month later, Miller contacted Appellant at this very number to arrange the delivery of the fatal drugs to the victim.

Appellant maintains, however, that the remainder of Russin's testimony was irrelevant and prejudicial because it portrayed Appellant as a drug dealer and a person of bad character. We disagree; the evidence was admissible under *res gestae* principles. The Commonwealth did not offer this evidence to demonstrate Appellant's propensity to sell drugs. It submitted this evidence to explain **why** Russin searched Appellant's room and called the Mike Jones phone number. Russin did not trust Appellant because she saw Appellant in possession of burner phones, he lied to her that he did not have an extra phone, and her car mysteriously disappeared at one point during

Appellant's residence in her house. Russin's suspicions caused her to search Appellant's room, locate the receipt, and call the Mike Jones phone number on the receipt. Absent this evidence, the jury would have viewed Russin's decision to search the room and call the Mike Jones phone number in a vacuum, and it probably would have found her conduct inexplicable. To give the jury a full and accurate picture of Russin's decision making, the trial court correctly admitted this evidence as part of the natural backdrop of this case.

Custer's testimony was admissible as well. Custer testified that she purchased heroin from Appellant for several years, including the months before and after the victim's death. Her practice was to text Appellant's number to arrange drug purchases and meet him at a Day's Inn to complete the purchases. Although she did not remember Appellant's number, she identified her own number in the call records for the Mike Jones phone number. In early 2018, Appellant told Custer that the heroin he was selling was really strong and to be careful, but she overdosed twice in less than a week. On another occasion in 2018, she learned from Appellant's girlfriend that he was out on bail and on house arrest for a girl that had died. Because Appellant could not come outside, he sold Custer heroin out of the bedroom window in his aunt's house. On cross-examination, defense counsel elicited Custer's testimony that she knew Appellant to be a drug user, and that she once drove him to a market where he stole cases of energy drinks. N.T., 9/24/19, at 314-19, 327-38.

As he did with regard to Russin's testimony, Appellant concedes that some of Custer's testimony was admissible while objecting to the rest. He admits that "Custer's testimony regarding the Mike Jones phone number belonging to [Appellant] tended to show identity—that the phone was actually owned and used by [Appellant]." Appellant's Brief at 36. The rest of Custer's testimony, Appellant contends, was prejudicial and irrelevant. We disagree. Appellant cannot complain about Custer's testimony that she knew Appellant used drugs and stole energy drinks because defense counsel elicited this testimony, not the Commonwealth. Custer's testimony about her practice of texting the Mike Jones phone number and then purchasing drugs from Appellant at a Day's Inn was relevant to show that the Mike Jones phone number belonged to Appellant—the very evidence that Appellant admits was admissible. *Id.* Finally, Custer's testimony that (1) Appellant sold Custer heroin shortly after his arrest on charges arising from the victim's death, and (2) Appellant told Custer that the heroin that he sold her was very strong, was admissible to show that Appellant intended to sell a controlled substance to the victim, an element of the principal charge against Appellant, drug delivery that causes death. 18 Pa.C.S.A. § 2506(a) (individual commits first-degree felony if he intentionally delivers controlled substance and another person dies as a result of using the substance); Pa.R.E. 404(b)(2) (other crimes evidence admissible to demonstrate defendant's intent).

In his next argument, Appellant asserts that the trial court erred by permitting the Commonwealth to present expert testimony by Detective Owens that bolstered the credibility of several fact witnesses on the subject of whether Appellant was using the Mike Jones phone number. As stated above, we review the trial court's decisions regarding admissibility of evidence for abuse of discretion. We conclude that Detective Owens improperly bolstered the credibility of several fact witnesses by testifying that his opinion was "consistent with" or "corroborated" their factual testimony. Nevertheless, any error in admitting his testimony was harmless due to the overwhelming evidence of Appellant's guilt.

Detective Owens testified as an expert witness in cellular phone records, cellular records analysis, digital forensics, and tower location data.[2] N.T., 9/24/19, at 373-74. Detective Owens created a PowerPoint that organized cell phone records, primarily records from the phones registered to Mike Jones, Miller, and the victim, as well as records of phone calls between Custer and Mike Jones, and between Russin and Mike Jones. The presentation also showed the general location of the Mike Jones, Lauren Miller, and victim cellphones on the morning of October 5, 2017. Cell phone records

_____

[2] Appellant does not suggest that these subjects were not proper subjects for expert testimony, or that Detective Owens lacked sufficient qualifications to testify as an expert on these subjects. Accordingly, we assume that these subjects were proper matters for expert testimony and that Detective Owens had sufficient expertise to testify about them.

corroborated Miller's testimony that the victim called her on the morning of October 5th and that Miller called the Mike Jones phone number numerous times on the same date. Cell phone tower data showed the victim's phone and Mike Jones' phone in Lancaster City that morning in partially overlapping areas.

The prosecutor asked Detective Owens, based on the witnesses' testimony, whether he could draw the conclusion that the Mike Jones phone number was associated with Appellant. Detective Owens replied that "[i]t is consistent with [Appellant] utilizing that telephone, absolutely." N.T., 9/24/19, at 391-92. Defense counsel objected, arguing that the prosecutor could not buttress his prior witnesses, and that the question whether the Mike Jones phone was associated with Appellant was not within the purview of Detective Owens' investigation. *Id.* at 392. The court directed the prosecutor to rephrase the question. The prosecutor asked, "To a reasonable degree of expert certainty, based on what you've heard in court and what you've seen in these records, do you draw a conclusion as to that phone number?" Detective Owens replied, "It's consistent with that telephone was utilized by [Appellant]." *Id.* Defense counsel began to object again, and the court overruled the objection. *Id.* at 392-93. Detective Owens referred to the Mike Jones phone as "[Appellant], aka Mike Jones," and "Mike Jones or [Appellant]" when discussing that it was located in Lancaster City at 10:45 a.m. on October 5th, possibly near the victim's phone. *Id.* at 396-97. Defense counsel

objected that Detective Owens was not qualified to testify as to who possessed the Mike Jones phone, and that he was buttressing the Commonwealth's witnesses by doing so. *Id.* at 398. The trial court instructed the prosecutor to have Detective Owens make clear that he was concluding that the phone belonged to Appellant based on Russin's testimony. *Id.* at 399.

The prosecutor clarified that Detective Owens based his testimony that Appellant was using the Mike Jones phone "in part" on witnesses' testimony. *Id.* at 400. The prosecutor asked, "So taking all of that, does that create a foundation for you, to a reasonable degree of professional expert certainty called for what you were doing with this presentation, that you associate the number with [Appellant]?" Detective Owens replied, "Correct." *Id.* Defense counsel objected again, arguing that Detective Owens could not make a credibility determination, which was "the unique province of the jury, about Mary Jo Russin, Stephanie Custer." *Id.* at 401. The trial court overruled the objection, holding that an expert was permitted to draw specific conclusions based on the testimony of other witnesses as well as records provided from telephone companies. *Id.*

Detective Owens described the process of "putting the phone in somebody's hand, because what I'm testifying to is the phone, not the person," and explained how he drew conclusions about who each phone number belonged to. *Id.* at 411-12. Defense counsel objected that Detective Owens was going beyond his expertise, and the court informed the prosecutor,

"I think that you need to clarify . . . that this witness in identifying that phone number as belonging to [Appellant] is basing that on the information provided by the witnesses." *Id.* at 414. Detective Owens acknowledged that he never saw Appellant dial any of these numbers, but he based his conclusion that it was Appellant's phone on "external factors." *Id.* at 415-16. Detective Owens explained that he based his conclusion that the Mike Jones phone belonged to Appellant on Miller's testimony and the fact that her phone call records were consistent with her testimony. *Id.* at 417 (detective's claim that telephone records "corroborat[ed] her testimony"); *see also id.* at 421 ("I'm corroborating a statement that was provided by a witness, saying that the information that they provided is consistent with the phone records that I've analyzed").

"[E]xpert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman." *Commonwealth v. Jones*, 240 A.3d 881, 891 (Pa. 2020). "An opinion is not objectionable just because it embraces an ultimate issue." Pa.R.E. 704.

"Opinion testimony must be based on either the expert's own knowledge of the facts or upon testimony by other witnesses." *Earlin v. Cravetz*, 399 A.2d 783, 785 (Pa. Super. 1979). "Determining witness credibility," however, "is exclusively the function of jurors, and expert witnesses are specifically prohibited from invading this province." *Commonwealth v. Maconeghy*,

171 A.3d 707, 712 (Pa. 2017) (expert witness may not express opinion that minor complainant was victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse, because "such testimony intrudes into the province of the jury relative to determining credibility"). The **Maconeghy** court held that there is "no material distinction between direct vouching (*e.g.*, 'I believe the complainant is telling the truth') and indirect vouching (*e.g.*, 'I conclude that the complainant was sexually assaulted based upon the history she related')." ***Id.*** at 713.

Although the law permitted Detective Owens to base his opinion, in whole or in part, on testimony by other fact witnesses, **Earlin**, 399 A.2d at 785, we conclude that he improperly vouched for these witnesses by repeatedly stating that his opinion was "consistent" with or "corroborate[d]" their testimony. These terms suggested to the jury that Detective Owens found these witnesses credible, a form of "indirect vouching" by an expert that our Supreme Court warned against in **Maconeghy**.

Under the harmless error doctrine, we must vacate Appellant's judgment of sentence unless we are "convinced beyond a reasonable doubt that the error is harmless." **Commonwealth v. Story**, 383 A.2d 155, 162 (Pa. 1978). We may consider error harmless only where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly

admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Taylor***, 209 A.3d 444, 450 (Pa. Super. 2019). "Harmless error exists where the appellate court is convinced beyond a reasonable doubt that the erroneously admitted evidence could not have contributed to the verdict. If there is a reasonable probability that an error may have contributed to the verdict, the error is not harmless." ***Id.***

In this case, the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. The principal charge against Appellant was drug delivery resulting in death, a felony under the Crimes Code requiring proof of intentional delivery of a controlled substance and the death of another person as a result of using the substance, 18 Pa.C.S.A. § 2506(a). To prove this charge, the Commonwealth introduced evidence of the victim's death on October 5, 2017 from acute fentanyl toxicity; Stoltzfus's testimony noting that the victim purchased drugs the same day from an "Elby" who was on house arrest; the police investigation uncovering text messages between the victim's phone and a phone belonging to Miller, who was on house arrest, and whom the police deduced was "Elby"; Miller's testimony regarding her coordination of the heroin delivery between Appellant and the victim on October 5, 2017; phone records connecting Miller's phone to the Mike Jones phone number on October 5, 2017; Miller's

testimony that the victim picked up drugs from Appellant and delivered several bags of heroin to Miller's house; Russin's testimony regarding her discovery of the Metro PCS box containing a receipt with the name Mike Jones and that, when she called the associated phone number, she recognized the voice of the person who answered as Appellant; Custer's testimony that she was in contact with Appellant via the Mike Jones phone number; tower location data that placed the Mike Jones phone and the victim's phone in the same area of Lancaster City on the morning of October 5, 2017; photographs on the victim's phone showing heroin glassines on the afternoon of October 5, 2017; and a text message between Miller and the victim the same afternoon stating, "You're the best, I owe you big-time." This evidence overwhelmingly demonstrates that Appellant intentionally delivered fentanyl to the victim after coordinating the sale through an accomplice,[3] Miller, and that the victim died as a result of using the fentanyl. Thus, the error in admitting the vouching testimony could not have contributed to the verdict.

Appellant was also charged with delivery of fentanyl, an offense under the Controlled Substance Act requiring proof of intentional delivery of a controlled substance. 35 P.S. § 780-113(a)(30). The Commonwealth contended at trial that Appellant violated this provision by delivering heroin to

---

[3] An accomplice is one who "knowingly and voluntarily cooperates with or aids another in the commission of a crime." *Commonwealth v. Manchas*, 633 A.2d 618, 627 (Pa. Super. 1993).

Miller. N.T., 9/25/19, at 502. The evidence supports this argument. Appellant coordinated a sale of heroin to Miller through phone calls on the Mike Jones phone, and Appellant gave heroin to the victim that she delivered to Miller. In view of this overwhelming evidence, the erroneously admitted vouching testimony could not have contributed to the verdict.

Appellant also was charged with conspiracy to deliver fentanyl, which requires proof that Appellant, with intent of facilitating the commission of the crime of delivery of fentanyl, agreed with another person that they or one or more of them will engage in conduct that constituted this crime. 18 Pa.C.S.A. § 903(a)(1). The evidence overwhelmingly demonstrates that Appellant entered an agreement[4] with Miller to deliver controlled substances to both the victim and Miller. The improper vouching testimony could not have contributed to the verdict.

The final charge against Appellant was criminal use of a communication facility, which requires proof that Appellant "use[d] a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under [Title 18] or . . . [t]he Controlled Substance, Drug, Device and Cosmetic Act." 18 Pa.C.S.A. § 7512(a). Once

_____

[4] Conspiracy and accomplice liability are different in that conspiracy requires proof of an additional factor which accomplice liability does not: the existence of an agreement. *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002). This case demonstrates that one person (Miller) can serve both as an accomplice to and conspirator with the defendant.

again, the evidence furnishes overwhelming evidence of guilt on this charge. and the error of the vouching testimony was so insignificant in comparison that it could not have contributed to the verdict.

For these reasons, the error in admitting Detective Owens' vouching testimony was harmless and does not entitle Appellant to relief.

Next, Appellant raises two arguments concerning the charge of delivery of fentanyl under the Controlled Substance Act. First, he contends that the charge of delivery of fentanyl merged at sentencing with the charge of drug delivery resulting in death. We conclude that these charges did not merge because they involved different criminal acts. The charge of delivery of fentanyl involved the delivery to Miller; the charge of delivery of a controlled substance resulting in death involved the delivery to the victim.

A claim that crimes merge for sentencing purposes raises a challenge to the legality of the sentence. *Commonwealth v. Martinez*, 153 A.3d 1025, 1029-30 (Pa. Super. 2016). We review this legal issue *de novo*, and our scope of review is plenary. *Id.*

The merger statute, 42 Pa.C.S.A. § 9765, provides:

No crimes shall merge for sentencing purposes unless the crimes arise from **a single criminal act** and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765 (emphasis added). Section 9765 prohibits merger "unless two distinct facts are present: 1) the crimes arise from a single

criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." *Commonwealth v. Golphin*, 161 A.3d 1009, 1029 (Pa. Super. 2017). In determining whether two or more convictions arose from a single criminal act for purposes of sentencing, we review the charging documents filed by the Commonwealth to examine the elements of the crimes charged by the Commonwealth. *Id.* Our inquiry may also include review of the trial evidence. *Id.* at 1031 (offenses did not merge at sentencing because "it is apparent from the criminal information, complaint, and affidavit of probable cause, as well as later reflected in the trial testimony, that the Commonwealth alleged criminal acts that constituted aggravated assault as distinct or delineated from the conduct that constituted third-degree murder").

Preliminarily, the Commonwealth argues that Appellant waived his merger argument by failing to raise it during trial. We disagree. Merger issues are non-waivable because they concern the legality of Appellant's sentence. *Commonwealth v. Martinez*, 153 A.3d 1025, 1030 n.2 (Pa. Super. 2016).

In this case, the complaint alleged, both in the charge of delivery of a controlled substance and the charge of delivery of a controlled substance resulting in death, that Appellant delivered fentanyl solely to the victim. The affidavit of probable cause appended to the complaint alleged that Appellant delivered fentanyl directly to the victim. Affidavit, ¶¶ 5, 7, 11. In the criminal information, the charge of delivering a controlled substance resulting in death

remained the same as in the complaint: it alleged only that Appellant delivered a controlled substance to the victim. Information, Count 2. On the other hand, the information expanded the charge of delivery of a controlled substance to include delivery to "both [the victim] and [] Miller." Information, Count 1. The Commonwealth further widened the boundary between the charges in its closing argument by arguing that delivery of a controlled substance only concerned "Miller [because] that's not resulting in death," N.T. 9/25/19, at 502, while delivery of a controlled substance resulting in death concerned the victim.

Thus, while the complaint originally alleged one and the same act (delivery to the victim) in both charges, the information expanded the delivery of controlled substance charge to include two acts (delivery to Miller and delivery to the victim) but did not amend the charge of delivery of a controlled substance resulting in death. Stated in terms of the merger statute, the two charges in the information did not involve a "single criminal act," because one charge encompassed the delivery to Miller while the other did not. Thus, the two offenses did not merge for purposes of sentencing.

Next, Appellant argues that if the delivery of fentanyl charge pertained to Miller, the evidence was insufficient to prove that Appellant delivered fentanyl to Miller. According to Appellant, Miller's testimony showed that she and the victim planned for the victim to obtain drugs from Appellant and

deliver them to Miller, but the testimony did not show that Appellant was aware of this plan. Appellant's Brief at 60. We disagree.

When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–26 (Pa. Super. 2016). It is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–93 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Crosley*, 180 A.3d 761, 767 (Pa. Super. 2018). As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994, 1001 (Pa. Super. 2015).

Here, the evidence demonstrates that Miller frequently purchased drugs from Appellant; Miller had multiple telephone conversations with Appellant on the Mike Jones phone on October 5, 2017; Miller coordinated the transfer of drugs from Appellant to the victim during these phone conversations; Miller

provided the victim and Appellant with a description of each other and told the victim where to meet Appellant to obtain the drugs; and the victim delivered drugs to Miller on the same day and then sent Miller a text thanking her. Construed in the light most favorable to the Commonwealth, this evidence clearly demonstrates that Appellant intended to furnish drugs to Miller with the victim acting as a go-between.

Lastly, Appellant argues that his sentence of 23½-62 years' imprisonment constituted an abuse of discretion because the trial court gave insufficient reasons for imposing a sentence above the aggravated range of the Sentencing Guidelines. We conclude that Appellant's sentence represents a proper exercise of the court's discretion.

Appellant's claims implicate the discretionary aspects of sentencing. We note:

> [A]n appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
> > (1) whether appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

* * *

> What constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." A claim that a sentence is manifestly excessive might raise a substantial question if the appellant's Rule 2119(f) statement sufficiently articulates the manner in which the sentence imposed violates a specific provision of the Sentencing Code or the norms underlying the sentencing process.

*Commonwealth v. McLaine*, 150 A.3d 70, 76 (Pa. Super. 2016).

Here, Appellant filed a timely notice of appeal and raised these discretionary sentencing claims before the trial court in post-sentence motions. Additionally, his appellate brief properly includes the required Pa.R.A.P. 2119(f) statement. We thus consider whether Appellant presents substantial questions invoking our review. This Court has held that the defendant raises a substantial question by contending that he "was sentenced outside of the aggravated range of the sentencing guidelines without sufficient justification from the court." *McLaine*, 150 A.3d at 76. Additionally, a claim that the court erred by imposing an aggravated range sentence without consideration of mitigating circumstances raises a substantial question. *Commonwealth v. Felmlee*, 828 A.2d 1105, 1107 (Pa. Super. 2003). Since Appellant's claims fall within these parameters, we conclude that Appellant raises a substantial question for review.

In reviewing the court's exercise of sentencing discretion, we recognize that

[t]he sentencing court may, in an appropriate case, deviate from the guidelines by fashioning a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community. In doing so, the sentencing judge must state of record the factual basis and specific reasons which compelled him or her to deviate from the guideline ranges. When evaluating a claim of this type, it is necessary to remember that the sentencing guidelines are advisory only.

*McLaine*, 150 A.3d at 76-77.

If the sentencing court takes into account a pre-sentence investigation report, "it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. 2004). In this case, the court relied on all information contained in the PSI report before imposing sentence, including Appellant's character, family history, and rehabilitative needs. Thus, the presumption arises that the court was aware of all relevant information regarding Appellant's character and weighed those considerations before imposing sentence.

The trial court explained:

The court noted Appellant was 37 years old, an age of sufficient maturity to understand the significance of his acts. He had no history of mental health treatment. Appellant obtained his GED in 2007 while in jail and there was nothing to indicate a lack of intellectual ability that would prevent him from understanding the difference between right and wrong. Appellant also had a very limited work history.

- 27 -

Despite Appellant's assertions to the contrary, the court properly considered his long history of substance abuse and addiction, while noting that prior treatment had not been successful.

The court reviewed Appellant's very extensive prior criminal record. This was now the 14th time Appellant appeared in court for new criminal charges since 1997, when he was a juvenile. In addition to prior felony drug convictions, Appellant also has very serious convictions for crimes of violence such as robbery and assault.

The court contemplated Appellant's rehabilitative needs, finding there was absolutely nothing to indicate he has made any attempt to change his lifestyle or is amenable to treatment. In addition to many new criminal convictions, Appellant has violated probation or parole a total of 15 times between 1998 and 2016 on several different dockets.

The court considered the nature and circumstances of these crimes, along with the gravity of the crimes in relation to impact on the victim and the community. This was now Appellant's third felony drug conviction, he has been willing to expose others to addiction, suffering, or death, and in this case his actions directly caused the death of another human being. Appellant was not related to the victim, they were not sharing drugs, and Appellant did not provide the drugs as a favor for a friend. Having overdosed himself, being rendered unconscious more than once using heroin, and warning Custer to be careful because the drugs were very strong, Appellant had a clear understanding of the potential lethality of the drugs he was selling. The victim's death was not an accident or a terrible mistake, but rather because Appellant was a predator preying on the addiction of others for pure profit.

The court took into consideration the penalties authorized by the Pennsylvania legislature for the crimes committed, the guidelines of the Sentencing Code, and those established by the Pennsylvania Commission on Sentencing.

The court considered the arguments of counsel, comments made by Appellant, comments made by the victim's aunt, and sentencing memorandums provided by both counsel. Attached to Appellant's sentencing memorandum was a psychological evaluation conducted on November 22, 2019, which noted that Appellant's full scale IQ was in the average range and Appellant

has been unable to remain in recovery for any extended period of time despite incarcerations and drug rehabilitation. Finally, the court determined a sentence of confinement that would be consistent with protection of the public.

After considering these factors, the court found that a sentence of total confinement was necessary because there was an undue risk Appellant would commit another crime if placed on probation or partial confinement. Appellant is not amenable to rehabilitation, he is in need of correctional treatment that can be provided most effectively by his commitment to an institution, Appellant is a danger to society, and society needs to be protected.

The court further determined a sentence above the aggravated range of the sentencing guidelines was warranted for the charges of delivery and drug delivery resulting in death because of the following aggravating circumstances not reflected in the sentencing guidelines worksheet: (1) prior record score of 11 greatly exceeded the maximum allowable of 5; (2) guidelines far too lenient for the prior record and crimes committed; (3) fifteen PVs between 1998 and 2016; (4) long history of not accepting treatment or taking responsibility; (5) lack of employment history other than selling drugs; (6) career criminal having been to court for new crimes or PVs 29 times over the past 22 years; (7) a lesser sentence would depreciate the seriousness of the crimes; (8) prior sentences for felony drug convictions failed to deter continued drug dealing; (9) no remorse; and (10) Appellant has made a mockery of the court and rule of law . . . .

Appellant asserts . . . that the court erred in refusing to consider his drug addiction as a significant factor contributing to his drug dealing, and in characterizing his failure to complete most of the drug treatment programs as a refusal to accept treatment. These assertions are contrary to the record. The court specifically stated that Appellant "has either not accepted the treatment or it hasn't worked, I don't know which, but he continues to commit crimes." The court also noted Appellant's addiction and attempts at treatment might be a factor in his criminal activity, but ultimately concluded Appellant's drug dealing was also motivated by greed. Any mitigation from Appellant's drug use was heavily outweighed by the other factors cited by the court. As such, this was not a case of trying to punish someone who suffers from addiction, but rather an individual who is profiting from it.

- 29 -

Trial Court Opinion, 5/6/20, at 23-25, 28-29 (footnotes omitted).

The trial court fully and carefully studied the PSI and all pertinent evidence of record. Its decision to sentence Appellant above the Guidelines to consecutive terms was within its discretion.

Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/07/2021